Case: 1:22−cv−02869 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 9/20/2022
Description: Pro Se Gen. Civ. (F−DECK)

Before this Honorable, the United States District Court in and for the district ascertained at law, the District of Columbia, being the constitutional capitol district ultimately governed by the Congress by express grant of legislative and all powers

Dr. Paul Maas Risenhoover, personally, and serving as a private proprietor dba Formosa National Taxpayers Alliance

v.                                                      Civil or Misc. No. 2022-_____

President Joseph Biden, Jr., Commander in Chief, personally commanding United States Military Government Formosa island,

Lloyd J. Austin, III, Secretary of the United States Department of Defense,

DSCA,   Director, Mr. James Hursch,

EMERGENCY EX PARTE COMPLAINT for TEMPORARY INJUNCTION for determination by civil jury de medietate linguae, for temporary injunction and declarations pursuant to 28 USC § 2201, 22 USC 3301(b)(5), the Arms Export Control Act (AECA), as amended [22 U.S.C. 2751, et. seq.], 22 CFR § 120.13, *United States,* when used in the geographical sense, includes the several states, the Commonwealth of Puerto Rico, the insular possessions of the United States, the District of Columbia, the Commonwealth of the Northern Mariana Islands, any territory or possession of the United States, and any territory or possession over which the United States exercises any powers of administration, legislation, and jurisdiction. See United States v. Rudy Yujen Tsai, 954 F.2d 155 (1992) (assuming, without argument, arms could be "exported" to Formosa… to the "Chung Shan Institute of Science and Technology in Taiwan, the top military research center of the Taiwanese government." Noting "Taiwan had sought to obtain the DSU-15 optical receiver through official channels, but the United States had refused to release the technology-"). But see, grant of certiorari, Estate of Liu v Military Intelligence Bureau on Formosa (assuming the island subject to the general jurisdiction of the United States (and see US v Morin, conspiracy in Philippines to murder American noncitizen entitled to protections of national treatment abroad, violates the peace of the United States), 18 USC 3185, 22 USC 611(m), 619, 22 CFR 51.1 (pre-2006 edition) and 22 CFR 120.13). In Liu, the conspiracy to murder a person enjoying American protection was launched on Formosa.

RECEIVED

SEP 20 2022

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia



1. Page 4 describes MacArthur as also an international officer, https://dl.ndl.go.jp/info:ndljp/pid/10284989, but his chain of command began and ended with the President of the United States of America as his constitutional Commander in Chief. https://history.state.gov/historicaldocuments/frus1945v07/d390 , https://history.state.gov/historicaldocuments/frus1945v07/d361

2. It is the duty of this Court to declare what the law is, and to provide for the President, where appropriate declarations determinative of the meaning of the law consistent with the President's duty to faithfully execute the law and see that the law shall be done.

3. In the Taiwan Enabling Act, and as codified in part at 22 USC 3301(b)(5), "provide weapons" means to give and not to sell munitions, armaments, and weapons. The US understood its defense obligations to the peoples on Formosa from 1949 to comport with this understanding under the China Aid Act extended to Formosa, the Mutual Defense Act, and the Defense of Formosa Resolution (Authorization of Force). Formosan taxpayers have standing to reclaim their funds from the Treasury, on espousal of such claims to the Department of State, the Department charged with relations with United States Military Government(s) abroad. (see Consular Dispatches, online at NARA (archives.gov), DOS to Spain, DOS to Cuba, DOS to Panama, DOS to various former Spanish colonies, for USMG Cuba). And see, infra, DOS Solicitor General, and SECNAV to SOS, SOS to SECNAV disputing whether USMG Santo Domingo was government by and for the US, or a foreign government by sovereign authority of and for the Dominican Republic through the intermediary of the USMG. "Our Government is not such successor, but merely an intervening power arranging the succession." https://babel.hathitrust.org/cgi/pt?id=hvd.hj16q3&view=page&seq=406&skin=2021&q1=successor%20intervening

Case 1:22-cv-02869-UNA   Document 1   Filed 09/20/22   Page 3 of 24

American control of Cuba is essentially and merely that of a temporary military occupant. Our obligations, therefore, are those which arise from that fact. Benefits to the island and obligations local to the island, so far as becoming obligations of the United States, would seem from their very nature obligations of the island or its people, and not of a military occupant entering for a single and temporary purpose.

If a protectorate would make the protector obliged by the concessions, we have not established a protectorate over Cuba, and it is needless to discuss the soundness of such a questionable proposition.

That all the debts which are or may be inherited by the government of Cuba from the Government of Spain are now debts of the United States, payable from the Federal Treasury, logically follows from the argument of the ambassador, and certainly seems to me a conclusion without law or reason or justice in support of it.

That we are wholly free from responsibility with regard to the affairs of the island while temporarily occupying it, is not pretended; but, as I have said, our duty is to do and abstain from those things which a mere temporary military occupant still theoretically at war with Spain ought to do and abstain from, and not the duty of assuming all the executory and other contracts which may belong to the past government or its successor.

Our Government is not such successor, but merely an intervening power arranging the succession. It did not make the contract of concession; it is not the beneficiary receiving the benefits said to accrue to the island from the cables, nor is it the island or locality to which the obligations are said to be locally attached. Neither does it appropriate to itself the revenue of the island.

In discussing the very celebrated decision in the case of debts on hypothecation due to Hesse Cassel, paid to Napoleon, and alleged by the restored Elector of Hesse not to be discharged thereby, Calvo (sec. 2489) remarks that the eminent authors of the decision to the contrary successfully established the distinction between the acts of a transitory conqueror—that is to say, one exercising authority only in virtue of a simple military occupancy and a conqueror whose title to govern permanently is recognized.

Assuming, as we can not but do, that our military intervention and present aims are legitimate, we violate no contract in taking the necessary temporary measures to effectuate those aims. That our military officers should confine themselves to measures consistent with the nature of our occupation is, I suppose, understood by the signal officer referred to by the ambassador, and I am inclined to disbelieve that a permanent telegraph system such as would be used by the French company in regular competition with the lines in question is in contemplation. See my opinion, recently furnished the Secretary of War, concerning contracts of the city of Havana.

It is not suggested that, except in case we are bound by the contract of concession, a telegraph line for our own temporary purpose and governmental use by us in accomplishing it and preventing bloodshed while doing so, would give just cause of complaint by the concessionary. It seems to me probable that whatever is done or contemplated is of that character. If not, you can further advise me.

I think it well to suggest a doubt, however, whether the two concessions constitute a legal and just obligation upon the people and government of Cuba, for the reason, among others, that both of them—one, of 1869, providing for a line from Santiago to Havana; the other, of 1895, a line from Manzanillo to Havana—were manifestly given in

Digitized by Google          Original from
HARVARD UNIVERSITY

4. Arakaki v. Lingle, 299 F. Supp. 2d 1129 (2003) found

jurisdiction for territorial or possession taxpayer standing, concomitant to federal taxpayer standing, in the context of, for example, whether the Palmyra Atoll, left out of Hawaii under the Admission Act, created causes of action and positive private rights for the proprietors to clear title as in the US v Fullard-Leo, which recognized the US only to be temporary occupants applying Hawaiian law as the "sovereigns of today". In the Platt Amendment, the US disavowed proprietary intentions to Cuban territorial and individual or personal allegiant sovereignty, but such a statement may be merely hortatory or precatory, certainly Spain would not be heard to complain if America annexed Cuba outright as a Freely Associated State, like Puerto Rico. "*The United States does not itself desire to acquire sovereignty, for the reason, among other things, that the United States seeks scrupulously to conform to its January 1, 1942 declaration that it seeks "no aggrandizement, territorial or other*"" . We know such an intention to be non-binding because it might be that *" the United States has, by a subterfuge, actually acquired the sovereignty "*.

https://history.state.gov/historicaldocuments/frus1951v06p1/d611 And see 1980 White House briefing (including written package) on Mosquito Indians human rights in Guatemala, to Terry Jack Risenhoover, Douglas Krieger, Ambassador William Middendorf III, and the first White House Conference of national religious leaders by Assistant Secretary of State Abrams. The British would not be heard to assert a renewed protectorate for the coastal Indians under Nicaragua

https://history.state.gov/historicaldocuments/frus1889/d173 .

*"In all these cases, as will be observed, the ceding Government has received assurances of the treatment to be accorded to the inhabitants of the ceded territory; but in no case in our diplomatic history has any one of these Governments asserted a right to intervene in our domestic affairs. Difficulties have at times arisen between the Federal Government and the inhabitants of Louisiana and Florida, but neither France nor Spain ever pretended that our treaty stipulations gave them a right to take part in the settlement of such disputes. The laws affecting the Territory of Alaska may be, and in some respects now are, unlike those governing the other Territories of the United*

*States. But it must be apparent that were the Indians inhabiting those possessions to protest against alleged discriminations to the Czar of Russia, the treaty of 1867 would not authorize His Imperial Majesty to demand of the United States a different treatment of our Indian wards; and that such interposition, if-made, would certainly not be regarded favorably by this Government."*

*"The ceding government in such cases retains, and can retain, no right of control or supervision over the conduct of the guardian to whom it commits the inhabitants whose allegiance is changed."*

https://history.state.gov/historicaldocuments/frus1888p1/d540

5. With Formosa, the US noted that while Joint Chiefs of Staff Directive of United States Military Government 1651 on the Sovereignty Status of Formosa, recognized that the Department of State viewed the island of Formosa as having already been returned to the Republic of CHINA, such arrangements were at most of a contingent title (Melissa Patterson, Debellatio in Iraq, Harvard Journal of International Law). In 1950, the US asserted in the UN organization that the Chinese had lost the right to perfunctory confirmation of title to Formosa,

https://history.state.gov/historicaldocuments/frus1949v09/d391

thereby asserting Principal Victor rights of the US which could be made consistent with the Note of October 25, 1950, to all members of the Far Eastern Commission at this District, asserting the US and allied victor powers to be the administering authorities for Formosa under Article 73 of the Charter of the United Nations, as the meaning to be given Article 2 of the Peace Treaty with Japan as definitive "travaux preparatoires".

https://history.state.gov/historicaldocuments/frus1950v06/d773,
https://history.state.gov/historicaldocuments/frus1950v06/d775

6. This Complaint seeks clarification under 22 U.S. Code § 2762, as to whether the President may provide for gratis defense of Formosa as provided in 22 U.S. Code § 2762(1) "the President may, without requirement for charge to any appropriation or contract authorization otherwise provided". Such gratis defense is provided Guam, American Samoa, Swains Island, Puerto Rico, the Philippines from 1898 to 1946 and beyond (including the 1972 Submarine Cable Agreement for Formosa to Zambales, for NSA purposes), USVI, CNMI, and all the guano islands in 22 USC 91 jurisdiction of the District of Hawaii, and 48 USC 644a. Nor did American

occupation of West Berlin, the Ryukyus, Bonins, Amamis, Nansei Shoto (Okinawa), southern Korean peninsula (US took assets vested from Japanese in trust for Koreans, not as American war booty or reparations), JCS 1651 as to takings on Formosa from all Japanese, Santo Domingo, Cuba from 1898 to 1903 and during later interventions, ever result in taxation of occupation costs, even though permitted, see Underhill v Hernandez (taking water for hygiene of occupation troops and the public is permitted use and lawful eminent domain without compensation under IHL and the law of belligerent occupation, laws, usages and customs of war).

7. The island of Taiwan has a defense materiel and services and training procurement office, and liaison office, in this District: http://www.tecrodm.us/about_dpd.html. Accord Dupont Circle Citizens Ass'n v. District of Columbia Board of Zoning Adjustment, 530 A.2d 1163 (1987), sought jurisdiction of this very Court for its' Defense Procurement Division in a building located at 1701 18th Street, N.W. That office cannot assert "sovereign immunity" when the President denies Taiwan or its officers in this District has any sovereignty which ought or might be recognized, as the consistent American practice (except to contested, disputed, or divided states such as the Korean peninsula under pending American right to resolve the ultimate disposition toward their promised independence by Japan) has been to recognize even that de facto sovereignty of actual governors comporting with the international laws of equal protection of noncitizens. This Court certainly cannot fictively grant such a sovereign immunity, because Article III of the Constitution conveys a limited grant from the sovereign people (even if as with Cuban islanders under Betancourt v Mutual Ins., this Court were inclined to find citizens of Chinese Taipei akin to free citizens of London, with domicile on Formosa, regardless of juridical absence of their Japanese nationality and citizenship), not from a sovereign federal government acting as a monarch, and because in Zivotofsky v Kerry, the Court held it lacked authority to recognize Jerusalem as David's Capitol in the Jewish State of Israel, because that authority largely first resided with determinations of the President, to be followed by ratification or further legislation of the Congress, antecedent to any interpretive action this Court might take in pursuance of her limited jurisdiction as a Court of American law.

8. DOD, DSCA, and Congress, and the President, take primary actions in this District for defense of Formosa to provide materiel and training thereas:

https://www.dsca.mil/sites/default/files/mas/taiwan_20-24.pdf,
https://www.dsca.mil/sites/default/files/mas/tecro_15-44.pdf ,
https://www.dsca.mil/sites/default/files/mas/taiwan_09-57_0.pdf,
https://www.dsca.mil/sites/default/files/mas/taiwan_09-37_0.pdf.
https://www.dsca.mil/search/node?keys=TAIPEI+ECONOMIC+AND+CULTURAL
+REPRESENTATIVE . Such actions are commercial in essence, and even if the
Court were inclined to find a government-in-exile (see statement of Foreign
Minister of Taiwan in exile on Taiwan, "present status of exile"
https://history.state.gov/historicaldocuments/frus1958-60v19/d203 , and
Chou Enlai to the UN, that Taiwan is in exile outside China,
https://history.state.gov/historicaldocuments/frus1949v09/d209 )

9. This Complaint asserts jurisdiction under the National Historic Preservation
Act (NHPA), 16 U.S.C. §§ 470 et seq., its implementing regulations and the
Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. 28 U.S.C. § 1331 as this
action arises under the laws of the United States. The Taiwan dugong habitat,
as well as the Dugong habitat, in Okinawa, constitute one physical and
ecological system on the continuous continental shelf that runs from Formosa
to Ishigaki Jima, and includes the Ryukyus or Okinawa. In making FMS (foreign
military sales) and DCS (direct commercial sales) to TAIWAN, the DOS and
DOD have failed to conduct even one EIS. Nor have any DOD warrant officers
sought definitive interpretive guidance from the Comptroller GENERAL of the
United States as to whether 22 USC 3301(b)(5) to provide weapons, means to
supply, not to sell, or whether 22 USC 3303(b)(5) means to treat Formosa as
foreign in a domestic sense, as unincorporated American territory, entitled to
self-determination (see US Japan FCN Treaty Protocol Articles 12 to 14,
assimilating Article 2 renounced areas of Japan to Okinawa and Puerto Rico),
and thus entitled to "foreign" (in a domestic sense) military "sales" as the
means by which "to provide"… defensive articles and weapons.

10. FORMOSAN and OKINAWA DUGONG (Dugong dugon) is a genetically isolated
and unique member of the Dugong species, a threatened marine mammal
species, listed as "endangered" under the U.S. Endangered Species Act (ESA),
16 U.S.C. §§ 1531 et seq. Fewer than fifty mature Formosan or Okinawa
Dugong remain ("Dugong Status Report and Action Plans for Countries and
Territories"
https://www.researchgate.net/publication/277113170_Dugong_Status_Repo
rt_and_Action_Plans_for_Countries_and_Territories *"It is unclear if they*

*would be making a longer journey from their stronghold at the northern end of Palawan Island in the Philippines to smaller green pastures in Taiwan."*). Preservation of the Formosan or Okinawa Dugong depends entirely upon the preservation of its generally coastal habitat (https://www.ntm.gov.tw/en/collection_166_2220_71640.html ). The Okinawa Dugong is a protected "Natural Monument" under Japan's "Law for the Protection of Cultural Properties." Because the list of protected cultural properties under Japan's Cultural Properties Law is the "equivalent" of the U.S. National Register of Historic Places, the Formosan or Okinawa Dugong is protected under the NHPA. See 16 U.S.C. § 470a-2.

11. DOS and DoD's failure to take into account the adverse effects of the design, preparation, approval, funding and delivery of the removal from Futenma and the defense of Formosa, including Seventh Fleet Operational Plan 7-50 for defense of Formosa and the Pescadores at sea and air and land, for purposes of avoiding or mitigating any adverse effects of such actions prior to the approval of such actions violates the NHPA and is unlawful. DOS and DOD's failure to take into account the adverse effects of its activities contemporaneous and subsequent to the preparation, approval, finding and delivery of the weapons systems and exercises (Han Kuang exercise contracted to Camber Corporation, which signs contracts in this District with FMS or DCS contract warrant(ed) officers), including appropriating Futenma relocation implementation funding, violates the NHPA and is unlawful.

12.   An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court may grant declaratory relief and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706.

13.   DOS and DOD's failure to comply with the requirements of the NHPA, 16 U.S.C. § 470a-2, is arbitrary, capricious, and not in accordance with procedures required by law pursuant to the APA and is thus subject to judicial review. 5 U.S.C. §§ 701 through 706.

14. DOD's failure to comply with the requirements of the NHPA, 16 U.S.C. § 470a-2, also constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by Section 706(1) of the APA and is thus subject to judicial review. 5 U.S.C. §§ 701 through 706.

15. Venue lies in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants maintain offices or reside in this judicial district.

16. Duarte v Dade
https://www.chanrobles.com/cralaw/1915octoberdecisions.php?id=220
explains how elections on Formosa does not change the status quo. Nor does the US war plan for implementing the New Taiwan Dollar, distinct from the juridical currency of the Republic of CHINA, in any sense favorably color claims of the latter to title to Formosa.
https://history.state.gov/historicaldocuments/frus1944v05/d1218

17. The US did not object to the El Salvador reservations to the Peace Treaty with Japan, nor did anyone object to the Senate reservations. El Salvador clearly stated the future disposition of Formosa must comport with inalienable rights of expatriation and self-determination, as Formosans remained legally Japanese.
https://treaties.un.org/doc/publication/unts/volume%20136/volume-136-i-1832-english.pdf

18. In respect of the Ryukyus the JCS determined to maintain the status quo, as territory in the process of detachment from Japan ("detached" incident the Peace Treaty) under Article IV(c) of the said Treaty.   See esp. paragraph 18, 9-17 https://history.state.gov/historicaldocuments/frus1952-54v14p2/d595

19. For relief Plaintiff prays this Court enjoin the United States Department of Defense from Foreign Military Sales to the Free Chinese government-in-exile's armed forces in exile, "located on Taiwan" (Zivotofsky v. Kerry), dba the Republic of CHINA, an unrecognized exile organization. (see CIA FOIA, Latvian exile organization, ie fn 18, 21, 24
https://www.cia.gov/readingroom/docs/CIA-RDP75-00001R000100040046-3.pdf ,
https://www.cia.gov/readingroom/docs/BROMBERGS%2C%20ARTURS%20%20%20VOL.%202_0089.pdf ). Also when the FMS are for the "Taiwan Armed Forces" and the "Taiwan Minister of Defense" as competent authorities for their authorization (22 USC 3314(2), 22 USC 3303(b)(4)), such munitions should only be handled by forces with semiotic symbols of Formosa, not Free

China in exile on the island, at least unless and until Congress enact organic law such as the British acts, https://hansard.parliament.uk/Lords/1966-10-27/debates/620c448d-ae94-47aa-82d9-7943a5f27ade/FormerPolishAlliesInGreatBritain , https://swarb.co.uk/amand-v-home-secretary-and-minister-of-defence-of-royal-netherlands-government-hl-1943/.   Allied Forces Act 1940 https://api.parliament.uk/historic-hansard/acts/allied-forces-act-1940 . Such law should provide for good government of the allied forces on Formosa, through their disciplined Military Government https://api.parliament.uk/historic-hansard/commons/1947/feb/10/new-clause-continuance-of-provisions-as#S5CV0433P0_19470210_HOC2_907 , in light of their history of genocide on the island (https://history.state.gov/historicaldocuments/frus1947v07/d361 ). See pages 342 to 400 or so https://babel.hathitrust.org/cgi/pt?id=mdp.39015078310664&view=page&seq=352&skin=2021&q1=de%20gaulle

20. Plaintiff further prays the Court enjoin US Seventh Fleet to defend the air and seas of Formosa, and to admit the Operational Plan available online in the digital library of the Japan National Diet Library, as amended to date, remains in force, the Fleet never having been ordered to stand down by the Commander in Chief, or subordinates duly authorized to do so by him for him. See page 167, especially page 169 for mission and critical definitions on https://dl.ndl.go.jp/info:ndljp/pid/9850614

21. When Republic of CHINA exile national security team members retire, the Chinese heritage or ethnicity members often travel back to China to pay homage to their heartfelt fatherland. For Formosans, Japan is the motherland. It cannot be said for the Formosans and Taiwanese, that there exists with Taiwan and the Republic of CHINA *"a unity of interest and ownership"* such that any *"individuality and separateness",* require imposition of the alter ego doctrine, Zoran Corp. v. Chen, 185 Cal. App. 4th 799 (2010). *The unity of husband and wife in today's America is not so close that a wife speaks for a husband, nor that a husband adopts his wife's words*. Singh v. Holder, 637 F.3d 1063 (2011), Singh v. Holder, 637 F.3d 1063 (2011), *Arranged marriages have largely given way to pairings based on romantic love. States have replaced coverture, the doctrine by which a married man and woman became a single legal entity, with laws that respect each participant's separate*

*status.* ROBERTS, C. J., dissenting in Obgerfell.

22. Formosa National Taxpayers Alliance asserts proprietary individual taxpayer status and standing, because compelled to file returns to revenue officers and agents, even though personally remaining a constitutional "Indian not taxed". The constitutional status of the "Indian not taxed" as unamenable to the taxing power is not affected by a unilateral and revocable grant of statutory citizenship by the Congress, as only an amendment can lawfully revisit that law of war status. Formosan native and indigenous peoples are wards of the (US) military government in command control of the island https://history.state.gov/search?q=formosa+AND+wards&within=documents&sort-by=relevance . Moreover, American national taxpayers on Formosa, are also compelled to make annual returns or report large accounts to general revenue officers of the Internal Revenue Service from their domiciles on Formosa.

23. Plaintiff/Petitioner/Movant prays for an accounting of all foreign military sales to Formosa, and recoupment from the general Treasury, including from unappropriated funds. The US in JCS 1651 on the Sovereignty Status of Formosa averred the US and UK by the October 25, 1950 note to the Far Eastern Commission, without protest, became definitive agency interpretation of Article 2 of the Peace Treaty with Japan as to Formosa, reposed by UN Charter Articles 107, 77(b) and 73, as territory like the Ryukyus, which America could entrust. And like Cuba from 1898 to 1903, see Betancourt v Mutual, the islanders of Cuba or of Formosa, were held to enjoy the right to sue in this Court (even if legally enemy aliens, of Japanese nationality) because ad interim enjoying American protection the islanders reciprocally owed duties of obedience rising to allegiance. The US told Korea that the allied powers were acting as trustees, of all Japanese held properties outside Japan Proper as delimited by SCAPIN 677 and as amended.

24. Article IV and XII of the Peace Treaty with Japan, in pari materia with Article XXVI, mean that the island of Formosa, however variously described in Articles II, IV(a), (b) and (c), XII a to d, or XXIII to XXVI, enjoy the right of self-determination:

*The United Nations General Assembly adopted resolutions in 1947, 1948, 1949, 1950, 1951, 1952, and 1953 which supported a free, independent, and unified*

*Korean Government representative of the wishes of the Korean people. The principles enunciated in these resolutions are just and equitable and constitute a broad framework upon which any political settlement for Korea should be based. The fundamental principles are as follows:*

*1.*

*The Korean question "is primarily a matter for the Korean people itself" and it "cannot be fairly resolved without the participation of representatives of the indigenous population." (UNGA Res. Nov. 14, 1947).*

*2.*

*The selection of representatives of the Korean people should be on the basis of adult suffrage and by secret ballot; the number of representatives from each voting area or zone should be proportionate to the population; and elections should be under the supervision of a [Page 107]United Nations commission of representatives of various non-Korean nations. (UNGA Res. Nov. 14, 1947).*

*https://history.state.gov/historicaldocuments/frus1952-54v16/d62*
*"One of these conditions is the right of all peoples to choose the form of Government under which they will live. The United States, [Page 557]therefore, has a definite interest that there should be a progressive enlargement of the political responsibilities, both as individuals and as groups of all the peoples of this region in order that they may be prepared and able to assume the responsibilities of natural freedom as well as to enjoy its rights. To this end we would wish to see in China and in other independent countries governments established on a broader basis of the population, and the elimination, so far as international security conditions and arrangements permit, of those conditions favoring foreign nationals which impair the sovereign rights of those countries; and in the dependent areas in this region we would wish to see the peoples given the opportunity to achieve a progressively larger measure of self-government."*
*https://history.state.gov/historicaldocuments/frus1945v06/d386*

*FOR USE IN REPLY TO POSSIBLE QUESTIONS AT THE SAN FRANCISCO CONFERENCE REGARDING JAPANESE ASSETS IN THAILAND UNDER ARTICLE* **16**

*The U.K. and U.S. Governments which since 1945 have acted as trustees of certain assets in Thailand which might possibly be considered as Japanese external assets, have found it necessary to give separate consideration outside of*

*Article 16 of the proposed Japanese Peace Treaty to the disposition of these assets because of their complex origins and of the conflicting claims revolving about them.*

*4.*

> *Another large portion of the total was similarly held in a U.K. custody account and regarded by the U.K. as war booty.*

> *5.*

> *Another substantial sum was held by the Thai Bureau of Enemy Property against which Thai citizens have placed war damage claims due to loss during the Japanese occupation.*

> *6.*

> *A final sum was held in a joint UK–US account in New York and was the proceeds of the sale of tin of undetermined origin—possibly looted from the Thai, possibly German, possibly Japanese.*[1]

*(a)*

> *That assets in Thailand of Jap ownership at time of first coming into force of Peace Treaty with Japan less such valid claims as are made against them shld under Art 16 of the Treaty be transferred by Japan to Internatl Comite of Red Cross.*

*(b)*

> *In view special circumstances, favorable consideration shld be given to transfer to Thai Govt of certain other assets in Thailand which have hitherto been held as 'Jap Assets'.*

*Documents in file 292.9441 indicate that the United Kingdom and the United States were unable to reach agreement in 1951 on the disposition of all items among the former Japanese assets in Thailand, and that therefore no final settlement was reached during the year.*

*https://history.state.gov/historicaldocuments/frus1951v06p1/d714*

  *The current status of Formosa and the Pescadores (distinct from that of the Nationalists who find themselves on the island) is given by the Treaty of Peace in quantum entangled superpositional terms:*

*2. If Japan renounces sovereignty in favor of no one, this would create a chaotic international situation, particularly if, as is possible, the United Nations does not approve the trusteeship agreement we shall propose. It might then be claimed*

a)

> that sovereignty was vested in the inhabitants, who could hereafter assert, perhaps with United Nations backing, a right to oust the United States;

b)

> that the victors in the war over Japan, including the U.S.S.R., have an inchoate right to sovereignty of these islands renounced by Japan in favor of no one in particular;

c)

> that the United Nations is entitled to deal, in its own way, with the islands and their inhabitants;

d)

> that the United States has, by a subterfuge, actually acquired the sovereignty.

*It is fully effective, at least so long as Japan is sovereign.*

*Exclusive strategic control is entirely compatible with residual sovereignty elsewhere, provided the sovereign grants it. We have exclusive strategic control over the former Japanese mandated Pacific islands and over the Panama Canal Zone, although in the former case sovereignty is vested in the United States, United Kingdom and France, and in the latter case in Panama.*

*[Page 1153]*
*The grant by Japan to the United States of continuing full powers over the islands might, however, be impaired if Japan itself renounces—in vacuum—its sovereignty. We would have a grantor which, itself, had no title.*

https://history.state.gov/historicaldocuments/frus1951v06p1/d611

The Treaty in Article II assimilates Formosa with:
*"recognizing the independence of Korea" (a work in progress), and "renounces all right, title and claim to the Kurile Islands, and to that portion of Sakhalin and the islands adjacent"* (as McDermott said, their status if analogous to Formosa, fn 46
https://history.state.gov/historicaldocuments/frus1949v09/d368 )
Japan has only limited retained rights (Shimabukuro case on residual sovereignty) because Japan is under a solemn duty to acquiesce (which the 7 Principle Note of the US also applied to Formosa):

*"will concur in any proposal"*… with America,

*"as the sole administering authority, Nansei Shoto south of 29deg. north latitude (including the Ryukyu Islands and the Daito Islands), Nanpo Shoto south of Sofu Gan (including the Bonin Islands, Rosario Island and the Volcano Islands) and Parece Vela and Marcus Island. Pending the making of such a proposal and affirmative action thereon, the United States will have the right to exercise all and any powers of administration, legislation and jurisdiction over the territory and inhabitants."*

These islands were variously returned to Japan, and islanders travel documents were variously issued by local commanders or Japan.

And *"in the areas referred to in Article 2, and their claims, including debts, against the authorities presently administering such areas and the residents (including juridical persons) thereof, and the disposition in Japan of property of such authorities and residents, and of claims, including debts, of such authorities and residents against Japan and its nationals, shall be the subject of special arrangements between Japan and such authorities."* So Formosa is also "such areas".

And Japan ratified (as did Cuba in 1903):

*"validity of dispositions of property of Japan and Japanese nationals made by or pursuant to directives of the United States Military Government in any of the areas referred to in Articles 2 and 3."* Even if this Article was primarily drafted in response to Korean demands, JCS 1651 also provided a basis akin to USAMGIK Vesting Order United States Military Government Ordinance 33.

https://history.state.gov/historicaldocuments/frus1946v08/d481,
https://history.state.gov/historicaldocuments/frus1952-54v14p2/d564,
https://history.state.gov/historicaldocuments/frus1947v06/d334

*It is not believed that Article IV, Section 3, of the United States Constitution would govern the disposition of Japanese reparation property transferred to USAMGIK, so that only Congress could authorize a subsequent transfer from Military Government to the national Korean administration. While title to the reparations property allocated to Korea would be in the United States, the United States would not be the beneficial owner, but rather a trustee holding legal title only. When the transfer is made from the Japanese owners it would at that time be clearly understood that the United States was taking title "for the benefit of the Korean people". Because of the trust thus declared, the property would not be such as to fall within the Constitutional provision for exclusive Congressional disposition of Federal Government property.*

*Judicial precedents bearing on this problem are unavailable, since the settlement after World War II presents the first occasion on which the United States has sought reparations from defeated enemy states. No sufficiently close analogies in which there are judicial decisions have been found.*

*\*\*\**

*" I added that, developing out of the Cairo and Potsdam Conferences, a mechanism had been set up in Moscow in December 1945 which placed the responsibility for the implementation of the pledge of Korean independence upon four powers and more directly on the United States and USSR."* https://history.state.gov/historicaldocuments/frus1947v06/d433

The Peace Treaty also assimilates Formosa (territory removed from Japanese control pursuant to the present Treaty [directly rebuking the Korean request that the Treaty renounce Korea nunc pro tunc to August 1945, https://history.state.gov/historicaldocuments/frus1951v06p1/d647 ]), with southern Korea, Yap, Guam, and the Philippines, regarding: *"connection Japan with territory removed from Japanese control pursuant to the present Treaty shall be equally divided, Japan retaining the Japanese terminal and adjoining half of the cable, and the detached territory the remainder of the cable and connecting terminal facilities."*
Hence, Formosa may deemed a "detached territory" in the process of defeasement from or return to "Japanese control" from which ad interim it has been removed "pursuant to the present Treaty".

The USAMGIK thought Southern Korean peninsula warranted exceptional MFN treatment
https://history.state.gov/historicaldocuments/frus1948v08/d486.

### *Article 12*

*(a) Japan declares its readiness promptly to enter into negotiations for the conclusion with each of the Allied Powers of treaties or agreements to place their trading, maritime and other commercial relations on a stable and friendly basis.*

Also, Formosa and the Ryukyus, Bonin, Amamis, southern Korea, were assimilated to Puerto Rico in the US Japan FCN Treaty Protocol (and mutatis mutandis in the Japan FCN Treaties with Malaysia, Indonesia, El Salvador, India, the UK, and similarly the US FCNs):

" juridical entities of, and persons domiciled in, any non-metropolitan territory of an Allied Power, and in the case of juridical entities of, and persons domiciled in, any state or province of an Allied Power having a federal government, by reference to the treatment accorded to Japan in such territory, state or province."

Hence the Treaty recognizes Formosans to be Japanese, merely, "domiciled in" Formosa.

And the Treaty provides: "a discriminatory measure shall not be considered to derogate from the grant of national or most-favored-nation treatment, as the case may be, if such measure is based on an exception customarily provided for in the commercial treaties of the party applying it, or on the need to safeguard that party's external financial position or balance of payments (except in respect to shipping and navigation), or on the need to maintain its essential security interests, and provided such measure is proportionate to the circumstances and not applied in an arbitrary or unreasonable manner."

This clause includes all the customary FCN Protocol treatment of appurtenant entities, occupation safeguards, and special treatment for insular areas entitled to self-determination.

(This clause does not require one to be a signatory, as in the ratification clause in Article 23, but merely a party, including a third party beneficiary by the Law of Treaties.)

"…any Party to the present Treaty there has arisen a dispute concerning the interpretation or execution of the Treaty, which is not settled by reference to a special claims tribunal or by other agreed means, the dispute shall, at the request of any party thereto, be referred for decision to the International Court of Justice." Formosa thus has standing to seek declaratory relief as this Court can refer the matter to her sister ICJ for resolution.

The phrase "…by the States which sign it, including Japan, " means that the later discussion of states emerging from signatories, can apply to Formosa, emerging, detached, from Japan, consequent the present Treaty.

The phrase "including the United States of America as the principal occupying Power," only provided the occupational authorities with some protocol courtesy (as the US Senate Report says), in that: " if nine months…

not later than three years after the date of deposit of Japan's ratification." Canada asked for deletion of principal occupying Power, and the US said if it were an affront it could be deleted without consequence.

There is a ministerial clause, and it would Formosa may adhere and compel the Archivist of the United States to accept such a document, and this Court may declare it to be so:

### Article 24

*All instruments of ratification shall be deposited with the Government of the United States of America which will notify all the signatory States of each such deposit, of the date of the coming into force of the Treaty under paragraph (a) of Article 23, and of any notifications made under paragraph (b) of Article 23.*

The Treaty recognizes Formsoa may be among the *"or any State which previously formed a part of the territory of a State named in Article 23,...provided that in each case the State concerned has signed and ratified the Treaty."*

The Treaty almost verbatim includes and integrates the US Senate reservation: *"the present Treaty shall not confer any rights, titles or benefits on any State which is not an Allied Power as herein defined; nor shall any right, title or interest of Japan be deemed to be diminished or prejudiced by any provision of the Treaty in favour of a State which is not an Allied Power as so defined."*
*https://treaties.un.org/doc/publication/unts/volume%20136/volume-136-i-1832-english.pdf*

And the Treaty provides Formosa may sign a treaty with Japan distinct from the Treaty of Taipei, which Acheson said did not confirm Chinese title to Formosa in TAIWAN, a question to which JAPAN and CHINA are legally incompetent to address absent the Allied Powers: *FYI word "terrs" shld not be employed in way to imply Formosa is for purposes of Treaty already legal Dept China. Such action wld make difficult any possible future UN action; also it is not believed to be matter to be determined only by bilat Sino-Jap arrangement.[5]*
https://history.state.gov/historicaldocuments/frus1951v06p1/d741 .
*"...or with any State which previously formed a part of the territory of a*

*State named in Article 23, which is not a signatory of the present Treaty, a bilateral Treaty of Peace on the same or substantially the same terms as are provided for in the present Treaty, but this obligation on the part of Japan will expire three years after the first coming into force of the present Treaty. Should Japan make a peace settlement or war claims settlement with any State granting that State greater advantages than those provided by the present Treaty, those same advantages shall be extended to the parties to the present Treaty."*

The Treaty notes the Archivist of the US hold a Ministerial duty amenable to this Court's All Writs Act mandamus and similar writ authorities:

*Article 27*

*The present Treaty shall be deposited in the archives of the Government of the United States of America which shall furnish each signatory State with a certified copy thereof.*

12. Senator Thurmond was wrong, and Pell right in noting:
S. REP. 96-7, S. Rep. No. 7, 96TH Cong., 1ST Sess. 1979, 1979 U.S.C.C.A.N. 36, 1979 WL 10326 (Leg.Hist.)
I. *ADDITIONAL VIEWS OF SENATOR CLAIBORNE PELL
IN CARRYING OUT ITS ACTIVITIES, THE INSTITUTE SHALL TAKE ALL APPROPRIATE STEPS TO STRENGTHEN AND EXPAND THE TIES BETWEEN THE PEOPLE OF THE UNITED STATES AND THOSE INDIVIDUALS AND ENTITIES ON TAIWAN THAT ARE REPRESENTATIVE OF THE MAJORITY OF THE PEOPLE ON TAIWAN. IN PROPOSING THIS AMENDMENT, **IT WAS MY INTENTION TO UNDERSCORE THE NEED FOR THE UNITED STATES TO SHOW ITS CONCERN FOR THE RIGHTS OF THE NATIVE TAIWANESE WHO CONSTITUTE 85 PERCENT OF TAIWAN'S POPULATION**, BUT WHO SHARE IN LITTLE OF THE ISLAND'S POLITICAL POWER. THE ROOTS OF THE TAIWANESE MAJORITY GO BACK SOME 300 YEARS, AND THE NATIVE TAIWANESE ALWAYS HAVE CONSIDERED THEMSELVES TO BE SEPARATE FROM MAINLAND CHINA. THE REGIME OF THE MAINLANDERS WHO ARRIVED ONLY AFTER WORLD WAR II HAS BEEN CHARACTERIZED BY SEVERE REPRESSION OF THE HUMAN RIGHTS OF NATIVE TAIWANESE, ALTHOUGH THERE HAS BEEN SOME IMPROVEMENT IN RECENT YEARS.TENSIONS BETWEEN THE NATIVE TAIWANESE \*\*80 AND THE*

*NATIONALIST GOVERNMENT HAVE, NOT SURPRISINGLY, BEEN HIGH AS THE TAIWANESE SOUGHT TO HAVE A GREATER SAY IN THEIR OWN GOVERNMENT. IN MY VIEW, THE UNITED STATES SHOULD HAVE BEEN FAITHFUL TO ITS ADHERENCE TO THE PRINCIPLE OF SELF-DETERMINATION BY PUSHING FOR AN INDEPENDENT TAIWAN AFTER WORLD WAR II.*

*ADDITIONAL VIEWS OF SENATOR JESSE HELMS OF NORTH CAROLINA INDEED, THE INSTITUTE BILL, AS IT EMERGES FROM COMMITTEE, MAKES A STRAIGHTFORWARD CASE THAT THE UNITED STATES, OR AT LEAST THE COMMITTEE ON FOREIGN RELATIONS OF THE UNITED STATES SENATE DOES NOT ACCEPT THE PRC VIEW. ALL OF THESE PROVISIONS DEMONSTRATE CLEARLY THAT THE UNITED STATES INTENDS TO CONSIDER THE GOVERNING AUTHORITIES ON TAIWAN TO BE SEIZED OF THE EXERCISE OF SOVEREIGN AUTHORITY OVER THE TERRITORIES CONTROLLED ON JANUARY 1, 1979, AND THAT THE AMERICAN INSTITUTE ON TAIWAN IS TANTAMOUNT TO AN OFFICIAL DIPLOMATIC MISSION OF THE UNITED STATES. THIS POSITION IS REINFORCED BY THE EXPLICIT PROVISIONS OF SECTION 114 REGARDING DEFENSE. THE ULTIMATE ATTRIBUTE OF SOVEREIGNTY IS SELF-DEFENSE. INDEED, THE TEST OF SOVEREIGNTY IS WHETHER A NATION POSSESSES THE CAPABILITY, EITHER ALONE OR IN CONJUNCTION WITH ALLIES, OF DEFENDING ITSELF AGAINST AGGRESSION FROM ANOTHER POWER. **THE CLAIM OF THE UNITED STATES TO PROVIDE THE PEOPLE ON TAIWAN (THAT IS TO SAY, ACCORDING TO SECTION 101(B), A CATEGORY THAT INCLUDES THE ROC GOVERNMENT) WITH WEAPONS OF A DEFENSIVE CHARACTER,** EVEN IN THE ABSENCE OF A MUTUAL DEFENSE TREATY AFTER 1980, IS TANTAMOUNT TO A DECLARATION BY CONGRESS THAT THE ROC GOVERNING AUTHORITIES LEGITIMATELY EXERCISE SOVEREIGN AUTHORITY AND POWER. INDEED, THE IMPLICIT ACKNOWLEDGMENT BY THE PRESIDENT OF THE UNITED STATES THAT THE MUTUAL DEFENSE TREATY WILL CONTINUE UNTIL DECEMBER 31, 1979, DESPITE THE RECOGNITION OF THE PRC AS 'SOLE GOVERNMENT OF CHINA' ON JANUARY 1, 1979, IS LEGALLY TANTAMOUNT TO RECOGNITION OF ROC SOVEREIGNTY.*

*Prayer for Relief*

1. *Immediately enjoin, ex parte, the United States, not from transferring, but from delaying transfer pending any payment, of weapons, of any character, to the island of Formosa, or to Ishigaki Jima or Okinawa for defense of Formosa and the appurtenant Japanese seas and air.*

2. *Order the Treasury to provide the foreign military sales accounts from the Defense Security Cooperation Agency for "TAIWAN" to this Court, under seal, ex parte, with any assertion which could be iterated under FOIA, of privilege, for their declassification and release to Movant.*

3. *Order Treasury to declare the sum of unappropriated funds available to recoup all foreign military sales to TAIWAN from 1979 to the present.*

4. *Declare that the word "provide" means to give, deliver, convey title and actual munitions and weapons systems including vessels and planes, missiles, and related sutler and services, including training such as the USPACOM Taiwan Armed Forces Joint Interoperability Training provided by the Camber Corporation.*

5. *Order the Camber Corporation to pay the trust fund established in this Court for the Formosan National Taxpayers Alliance, all sums advanced from the US or TAIWAN for the annual Han Kuang joint US ROC Taiwan Armed Forces exercises and interoperability efforts.*

6. *Concomitantly order the Secretary of Defense to pay Camber Corporation the sums recouped to the Formosan taxpayers trust fund.*

7. This Court enjoins the United States Department of Defense from Foreign Military Sales to the Free Chinese government-in-exile's armed forces in exile, "located on Taiwan" (Zivotofsky v. Kerry), dba the Republic of CHINA, an unrecognized exile organization.

8. This Court enjoins US Seventh Fleet to defend the air and seas of Formosa, and to admit the Operational Plan available online in the digital library of the Japan National Diet Library, as amended to date, remains in force, the Fleet never having been ordered to stand down by the Commander in Chief, or subordinates duly authorized to do so by him for him. See page 167, especially page 169 for mission and critical definitions on https://dl.ndl.go.jp/info:ndljp/pid/9850614.

9. This Court orders an accounting of all foreign military sales to Formosa, and recoupment from the general Treasury, including from unappropriated funds. Accord authority of Cobell v Salazar. https://history.state.gov/search?q=%22temporary+occupant%22+AND+british+AND+petroleum&within=documents&sort-by=relevance . The Secretary of State opined US retained residual responsibilities for Formosa and the Spratly and Paracels, to the Kuriles, https://history.state.gov/historicaldocuments/frus1955-57v03/d186 pursuant supreme Law of the Land, the Peace Treaty with Japan.

10. Declare and issue the writ of mandamus to the Archivist of the United States to accept the accession of Formosa to the Peace Treaty with Japan, as the detached territory in the process of detachment and defeasement from Japan Proper.

11. Declare and issue mandamus for the Archivist to issue a true copy of the Treaty to Formosa.


Additional RELIEF

 WHEREFORE, for all the foregoing reasons, Plaintiffs request that this Court issue:


1. A judgment declaring that DoD's activities connected to the dugong habitat in Formosa to Okinawa including Ishigaki Jima, and implementation of the Futenma relocation fail to comply with the requirements of the NHPA, 16 U.S.C. § 470a2;


2. A judgment declaring that DOD is failing and has failed to comply with the requirements of the NHPA, 16 U.S.C. § 470a-2, and that such failure is arbitrary, capricious, and not in accordance with procedures required by law pursuant to the APA, 5 U.S.C. §§ 701 through 706.


3. A judgment declaring that DOD is failing and has failed to comply with the requirements of the NHPA, 16 U.S.C. § 470a-2, and that such failure constitutes agency action that is unreasonably delayed and/or unlawfully withheld as provided by Section 706(1) of the APA.


Respectfully submitted,

Signed: _____

Dr. Paul Maas Risenhoover
Proprietor, personally appearing, dba Formosa National Taxpayers Alliance
27-1 Yu Nung Rd. 5th Fl. 1-2, 5A3, East District, Tainan 70164, Formosa island
AmericanFormosaTrustArea@gmail.com,
AmericanFormosaTrustTerritory@gmail.com
/s/ 28 USC 1746(2)


Attested under penalty of perjury within the US, its territories and possessions, on FORMOSA island


/s/ //s// X   invoking 25 USC 2904 citizen Potawatomi illiterate in native tongue

Signed: _____

_____

Dr. Paul Maas Risenhoover, JD, DRC, Esq., Attorney at Law in the Kingdom of Hawaii
Palmyra Atoll and Guantananmo Perpetual Lease Areas, under the USA, a
Potawatomi Indian Executive Director, Robin Hood International Human Rights Legal
Defense Fund of the Yeshiva Bnai Noah of the Bnai Noah Religious Society, and
Spiritual Adviser, Allied American Formosa Trust Territory in formation Tainan,
Taiwan, FORMOSA, West Pacific

AmericanSTEAMTargetOfficeR@gmail.com,
FormosaCivilGovernment@gmail.com,
NationalSTEAMTargetOfficer@gmail.com,
drpaulmaas@gmail.com,
ilovelibby@gmail.com,
Project14thAmendment@gmail.com

22 USC 619, 22 USC 611(m), 22 CFR 51.1, 22 CFR 120.13, 18 USC 3185, Neely v
Henkel, Pearcy v Stranahan (no such relinquishment Treaty exists for US unless the
FCN be so deemed in favor of Japan, see implying JCS 1651 is ended and SCAPIN 677
ceased preventing Japan from administering Formosa
https://history.state.gov/historicaldocuments/frus1950v06/d774   ( c) What is the
United States interpretation of Article 9 of the Japanese Constitution (Renunciation
of War)? The United States respects this provision as an expression of the popular
will in Japan embodied in Japan's fundamental law. Interpretation of the provision as
it bears on Japan's right to defend itself from unprovoked attack, and to prepare for
defense against attack, is a matter of Japanese concern under procedures set forth in
the Constitution. Should the requisite majorities of the Diet and the people desire to
amend the provision that too would lie within their power. (d) What is the United
States view regarding Japan's continuing adherence to policy decisions adopted by
the Far Eastern Commission, and to directives and orders issued by the Supreme
Commander for the Allied Powers? It is considered that the peace treaty will be the
sole expression of Allied views binding on Japan after the treaty comes into effect.
While it is to be hoped that Japan will continue to observe FEC decisions and SCAP
directives of lasting value even though those decisions and directives are not
specifically confirmed in the treaty, this would be a matter for the Japanese to
decide.)

28 USC 1746(2) affirmed under penalty of perjury (dischargeable)